541 So.2d 96 (1989)
PUBLIC HEALTH TRUST OF DADE COUNTY, Florida, Petitioner,
v.
Norma WONS, Respondent.
No. 69970.
Supreme Court of Florida.
March 16, 1989.
Robert A. Ginsburg, Dade County Atty. and Aurora Ares, Asst. County Atty., Miami, for petitioner.
John D. Kelner of Kelner & Kelner, Miami, for respondent.
Martin G. Brooks of Martin G. Brooks, P.A., Hollywood, and Donald T. Ridley, Legal Department, Brooklyn, N.Y., amicus curiae for Watchtower Bible and Tract Soc. of New York, Inc.
Robert M. Buckel, Naples, amicus curiae for Christian Information Service, Inc.
*97 KOGAN, Justice.
The Third District Court of Appeal has certified the following question as one of great public importance:
WHETHER A COMPETENT ADULT HAS A LAWFUL RIGHT TO REFUSE A BLOOD TRANSFUSION WITHOUT WHICH SHE MAY WELL DIE.
Wons v. Public Health Trust, 500 So.2d 679, 680 (Fla. 3d DCA 1987). This Court has jurisdiction pursuant to article V, section 3(b)(4), of the Florida Constitution. We answer the certified question in the affirmative and approve the decision of the third district.
The issues presented by this difficult case challenge us to balance the right of an individual to practice her religion, and protect her right of privacy against the state's interest in maintaining life and protecting innocent third parties.
Norma Wons entered Jackson Memorial Hospital, a medical facility operated by the Public Health Trust of Dade County, with a condition known as dysfunctional uterine bleeding. Doctors informed Mrs. Wons that she would require treatment in the form of a blood transfusion or she would, in all probability, die. Mrs. Wons, a practicing Jehovah's Witness and mother of two minor children, declined the treatment on grounds that it violated her religious principles to receive blood from outside her own body. At the time she refused consent Mrs. Wons was conscious and able to reach an informed decision concerning her treatment.
The Health Trust petitioned the circuit court to force Mrs. Wons to undergo a blood transfusion. At the hearing Mrs. Wons' husband testified that he fully supported his wife's decision to refuse the treatment and that, in the unfortunate event she were to die, their two children would be cared for by Mr. Wons and Mrs. Wons' mother and brothers. Nevertheless, the court granted the petition, ordering the hospital doctors to administer the blood transfusion, which was done while Mrs. Wons was unconscious. The trial judge reasoned that minor children have a right to be reared by two loving parents, a right which overrides the mother's rights of free religious exercise and privacy. Upon regaining consciousness, Mrs. Wons appealed to the third district which reversed the order. After holding that the case was not moot due to the recurring nature of Mrs. Wons' condition (i.e., it was capable of repetition, yet evading review), the district court held that Mrs. Wons' constitutional rights of religion and privacy could not be overridden by the state's purported interests.
An individual's right to refuse medical treatment must be analyzed in terms of our decision in Satz v. Perlmutter, 379 So.2d 359 (Fla. 1980), aff'g 362 So.2d 160 (Fla. 4th DCA 1978). That case, in which this Court adopted the fourth district's reasoning in full, established four criteria wherein the right to refuse medical treatment may be overridden by a compelling state interest. These factors are:
1) Preservation of life,
2) protection of innocent third parties,
3) prevention of suicide, and
4) maintenance of the ethical integrity of the medical profession.
362 So.2d at 162. It is important to note that these factors are by no means a bright-line test, capable of resolving every dispute regarding the refusal of medical treatment. Rather, they are intended merely as factors to be considered while reaching the difficult decision of when a compelling state interest may override the basic constitutional rights of privacy and religious freedom.
The Health Trust asserts that the children's right to be reared by two loving parents is sufficient to trigger the second compelling state interest in the Perlmutter list of criteria. While we agree that the nurturing and support by two parents is important in the development of any child, it is not sufficient to override fundamental constitutional rights. St. Mary's Hosp. v. Ramsey, 465 So.2d 666 (Fla. 4th DCA 1985). See also In re Osborne, 294 A.2d 372 (D.C. 1972); In re Estate of Brooks, 32 Ill.2d 361, 205 N.E.2d 435 (1965); Mercy Hosp. Inc. v. Jackson, 62 Md. App. 409, 489 A.2d 1130 *98 (1985), vacated on other grounds, 306 Md. 556, 510 A.2d 562 (1986); In re Brown, 478 So.2d 1033 (Miss. 1985). As the district court noted in its highly articulate opinion below:
Central to Ramsey and the above line of cases in other jurisdictions is a delicate balancing analysis in which the courts weigh, on the one hand, the patient's constitutional right of privacy and right to practice one's religion, as against certain basic societal interests. Obviously, there are no preordained answers to such problematic questions and the results reached in these cases are highly debatable. Running through all of these decisions, however, is the courts' deeply imbedded belief, rooted in our constitutional traditions, that an individual has a fundamental right to be left alone so that he is free to lead his private life according to his own beliefs free from unreasonable governmental interference. Surely nothing, in the last analysis, is more private or more sacred than one's religion or view of life, and here the courts, quite properly, have given great deference to the individual's right to make decisions vitally affecting his private life according to his own conscience. It is difficult to overstate this right because it is, without exaggeration, the very bedrock on which this country was founded.
Wons, 500 So.2d at 686-87. We hold that the state's interest in maintaining a home with two parents for the minor children does not override Mrs. Wons' constitutional rights of privacy and religion.
The Health Trust expressed concern during oral argument that in future cases of this nature, the inconvenience of taking each treatment refusal case to court for an emergency judicial hearing would create problems. The Health Trust complains that this would present too heavy a burden on the hospitals to provide care between court appearances. While we understand the Health Trust's dilemma, these cases demand individual attention. No blanket rule is feasible which could sufficiently cover all occasions in which this situation will arise. Thus, it will be necessary for hospitals that wish to contest a patient's refusal of treatment to commence court proceedings and sustain the heavy burden of proof that the state's interest outweighs the patient's constitutional rights.
We can add no more to the third district's well-reasoned and eloquent opinion. Accordingly, we answer the certified question in the affirmative and approve the decision of the district court.
It is so ordered.
McDONALD, SHAW, BARKETT and GRIMES, JJ., concur.
EHRLICH, C.J., concurs specially with an opinion, in which GRIMES, J., concurs.
OVERTON, J., dissents with an opinion.
EHRLICH, Chief Justice, concurring specially.
The dissent makes a compelling argument that the state's interests warrant ordering the blood transfusion in this case. However, I concur with the majority, and write to emphasize that contrary to the position of the dissent, this decision is consistent with Satz v. Perlmutter, 379 So.2d 359 (Fla. 1980), aff'g 362 So.2d 160 (Fla. 4th DCA 1978).
The primary state interest advanced in this case, the protection of innocent third parties has its basis in the doctrine of parens patriae, and seeks to prevent the abandonment of minor children. Perlmutter, 362 So.2d at 162. There would be no abandonment in this case. The uncontradicted testimony shows that in the event of Mrs. Wons' death her two minor children would be cared for by their father, with the aid of their grandmother and uncles.
This situation is nearly identical to that in In re Osborne, 294 A.2d 372 (D.C. 1972), where the court affirmed the trial judge's order refusing to give consent to administration of a blood transfusion to a competent Jehovah's Witness. The trial judge
took note of a possible overriding state interest based on the fact that the patient *99 had two young children. It was concluded, however, that the maturity of this lucid patient, his long-standing beliefs and those of his family did not justify state intervention... . [I]t was revealed that a close family relationship existed which went beyond the immediate members, [and] that the children would be well cared for... .
Id. at 374 (footnote omitted). Similarly, in Mercy Hospital, Inc. v. Jackson, 62 Md. App. 409, 489 A.2d 1130 (Ct.Spec.App. 1985), vacated on other grounds, 306 Md. 556, 510 A.2d 562 (1986) (case moot), the Maryland Court of Special Appeals affirmed the denial of Mercy Hospital's petition for appointment of a guardian for a pregnant Jehovah's Witness in order to gain consent for a blood transfusion the medical staff deemed necessary to perform a Caesarean section. Significantly, "[t]he circuit court found that despite the risks to the mother, delivery by Caesarean section without blood transfusions posed virtually no threat to the health of the fetus." Id. 62 Md. App. at 412 n. 2, 489 A.2d at 1131 n. 2. The Court of Special Appeals agreed with the trial judge that
"a competent, pregnant adult does have the paramount right to refuse a blood transfusion in accordance with her religious beliefs, where such decision is made knowingly and voluntarily and will not endanger the delivery, survival or support of the fetus."
Id. at 412, 489 A.2d at 1134. Further, in St. Mary's Hospital v. Ramsey, 465 So.2d 666 (Fla. 4th DCA 1985), the fact that the minor child resided with the mother in another state was only one of three factors the court considered in determining that the refusal of treatment by the father would not be an abandonment. The court also considered that "the mother, and both families, will help to support the child... . [A]nd finally, there is evidence that the patient owns a small annuity which names the child as beneficiary." Id. at 668.[1]
I agree with the district court below that "[t]he parens patriae doctrine invoked herein cannot ... measure increments of love; it cannot mandate a two-parent, rather than a one-parent family; it is solely concerned with seeing to it that minor children are cared for and are not abandoned." Wons v. Public Health Trust, 500 So.2d 679, 688 (Fla. 3rd DCA 1987). Absent evidence that a minor child will be abandoned, the state has no compelling interest sufficient to override the competent patient's right to refuse treatment.[2] Sweeping claims about the need to preserve the lives of parents with minor children have an emotional appeal that facilely avoids both the constitutionally required scrutiny of the state's authority to act and the search for less restrictive alternatives.
Petitioner conceded below that the other interests enumerated in Perlmutter are not implicated in this case. Wons, 500 So.2d at 687. I agree with the majority that the factors listed in Perlmutter do not constitute a bright-line test to delineate when the state's interests are sufficient to override a competent patient's basic constitutional rights. However, analysis of those other interests supports the decision in this case.
Perhaps the most important of the state interests discussed in Perlmutter is the interest in the preservation of life. In In re Conroy, 98 N.J. 321, 349-50, 486 A.2d 1209, 1223 (1985), the New Jersey Supreme Court discussed this interest at length:

*100 The state's interest in preserving life is commonly considered the most significant of the four state interests. It may be seen as embracing two separate but related concerns: an interest in preserving the life of the particular patient, and an interest in preserving the sanctity of all life.
While both of these state interests in life are certainly strong, in themselves they will usually not foreclose a competent person from declining life-sustaining medical treatment for himself. This is because the life that the state is seeking to protect in such a situation is the life of the same person who has competently decided to forego the medical intervention; it is not some other actual or potential life that cannot adequately protect itself.
In cases that do not involve the protection of the actual or potential life of someone other than the decisionmaker, the state's indirect and abstract interest in preserving the life of the competent patient generally gives way to the patient's much stronger personal interest in directing the course of his own life.
(Citations omitted.) The dissent may be correct that the state's interest in the preservation of life lessens where the prognosis is poor for recovery even with medical treatment. Implicit in that view, however, is the recognition that the quality of life for the patient if treatment is administered must be taken into consideration. It does not necessarily follow that where there is a favorable medical prognosis the state's interest automatically overrides the patient's right to refuse treatment. In some circumstances the cost to the individual of the life-prolonging treatment, in economic, emotional, or as in this case, spiritual terms, may be too high. See Superintendent of Belchertown State School v. Saikewicz, 373 Mass. 728, 370 N.E.2d 417 (1977). That "cost" must be looked at from the patient's point of view. The dissent assumes that after the blood transfusion Mrs. Wons "could return to a normal life." Is that really the case? Mrs. Wons is a Jehovah's Witness, as are the other members of her family. Receiving a blood transfusion is a serious sin for someone of her faith. After the transfusion she must live with the knowledge of that sin, and, because she has a recurring condition, she must also live with the knowledge that should she again become critically ill, she may again be forced to receive blood. Given the strength of the faith she and her family share, that knowledge must affect not only Mrs. Wons, but her family as well. From her perspective, this situation can hardly be considered "normal." Where a competent adult is involved, the best evidence of how that person views the consequences of accepting medical treatment is that person's own statements and actions. It is not for the court to second guess, or make judgments of, the reasonableness of that view. As the Supreme Judicial Court of Massachusetts stated in Saikewicz:
The constitutional right to privacy, as we conceive it, is an expression of the sanctity of individual free choice and self-determination as fundamental constituents of life. The value of life as so perceived is lessened not by a decision to refuse treatment, but by the failure to allow a competent human being the right of choice.
370 N.E.2d at 426 (footnote omitted).
The other two state interests discussed in Perlmutter are the duty to prevent suicide and the maintenance of the ethical integrity of the medical profession. It is uncontested that this case does not implicate the state's interest in the prevention of suicide. Mrs. Wons does not desire to die. Rather, she has chosen not to live, if to do so would require that she receive blood. Should she die because no blood transfusion is administered, her death would be of natural causes, not suicide. See Perlmutter, 362 So.2d at 163 ("This basic wish to live, plus the fact that he did not self-induce his horrible affliction, precludes his further refusal of treatment being classed as attempted suicide.").
The preservation of the ethical integrity of the medical profession is, in my view, the least compelling of the state interests involved. As the court stated in Saikewicz:

*101 Recognition of the right to refuse necessary treatment in appropriate circumstances is consistent with existing medical mores; such a doctrine does not threaten either the integrity of the medical profession, the proper role of hospitals in caring for such patients or the State's interest in protecting the same. It is not necessary to deny a right of self-determination to a patient in order to recognize the interests of doctors, hospitals, and medical personnel in attendance on the patient. Also, if the doctrines of informed consent and right of privacy have as their foundations the right to bodily integrity, and control of one's own fate, then those right are superior to the institutional considerations.
370 N.E.2d at 426-27 (citation omitted; footnote omitted) (quoted with approval in Perlmutter, 362 So.2d at 163-64). Further,
even if doctors were exhorted to attempt to cure or sustain their patients under all circumstances, that moral and professional imperative, at least in cases of patients who were clearly competent, presumably would not require doctors to go beyond advising the patient of the risks of foregoing treatment and urging the patient to accept the medical intervention. If the patient rejected the doctor's advice, the onus of that decision would rest on the patient, not the doctor. Indeed, if the patient's right to informed consent is to have any meaning at all, it must be accorded respect even when it conflicts with the advice of the doctor or the values of the medical profession as a whole.

In re Conroy, 98 N.J. at 352-53, 486 A.2d at 1225 (emphasis added; citations omitted). See also In re Brown, 478 So.2d 1033 (Miss. 1985). Given the fundamental nature of the constitutional rights involved, protection of the ethical integrity of the medical profession alone could never override those rights.
Further, circumstances such as these are clearly distinguishable from the instances cited by the dissent where state interests have been held to override the right to act according to one's religious beliefs. Most, like snake-handling, are prohibitions against taking affirmative religiously grounded action. Only requiring compulsory medical vaccination involves a refusal to act because of religious principles, and there the state interest in preventing the wide-spread danger to public health is great. See In re Estate of Brooks, 32 Ill.2d 361, 368, 205 N.E.2d 435, 439 (1965); In re Brown, 478 So.2d at 1037. As Justice Brennan noted in his concurring opinion in School District v. Schempp, 374 U.S. 203, 250, 83 S.Ct. 1560, 1586, 10 L.Ed.2d 844 (1963) (Brennan, J., concurring), "we must not confuse the issue of governmental power to regulate or prohibit conduct motivated by religious beliefs with the quite different problem of governmental authority to compel behavior offensive to religious principles." (Emphasis in original.) Where the religiously grounded "action" the state is attempting to prohibit is a refusal to act rather than affirmative conduct, the state may only interfere where there is a grave and immediate public danger. In re Brown, 478 So.2d at 1037. No affirmative conduct is present in this case. By forcing Mrs. Wons to submit to a blood transfusion forbidden by her religious beliefs, the state compelled rather than prohibited affirmative conduct, and there was no immediate public danger posed by her refusal to consent to the transfusion. Therefore, cases concerning the prohibition of affirmative religiously based conduct are inapposite to this case. See In re Estate of Brooks, 32 Ill.2d at 368-72, 205 N.E.2d at 439.
The dissent is concerned that our decision in this case reaches too far beyond the scope of our decision in Perlmutter. It is important to note that Perlmutter was a case grounded primarily in the rights of privacy and self-determination derived from the federal Constitution and the common law. Perlmutter, 362 So.2d at 164. That case was decided prior to the addition in 1980 of article I, section 23, of the Florida Constitution, which states in relevant part: "Every natural person has the right to be let alone and free from governmental intrusion into his private life except as otherwise *102 provided herein." In Winfield v. Division of Pari-Mutuel Wagering, 477 So.2d 544, 548 (Fla. 1985), this Court stated that
[s]ince the people of this state exercised their prerogative and enacted an amendment to the Florida Constitution which expressly and succinctly provides for a strong right of privacy not found in the United States Constitution, it can only be concluded that the right is much broader in scope than that of the Federal Constitution.
Since Perlmutter, the people of this state have chosen to provide more protection for privacy rights in Florida than that provided by the United States Constitution. That alone could justify broadening the scope of that decision. This case also implicates the right to free exercise of religion, not a factor in Perlmutter. Further, although Perlmutter contained a caveat that the decision was limited to its facts, that decision also emphasized that such situations must be addressed on a case-by-case basis. The facts of each case must be analyzed in terms of the important constitutional rights implicated and the competing state interests involved. The facts of this case do not show that the state has a compelling interest sufficient to override Mrs. Wons' rights of privacy and the free exercise of her religion.
Mrs. Wons did not, and does not, wish to die should her condition recur. However, because of her strong religious beliefs, she has chosen to face death rather than to accept a blood transfusion. Rather than being "totally unnecessary," as the dissent states, in her view her death could be necessary to ensure her spiritual life. The medical profession may consider a blood transfusion a rather ordinary or routine procedure, but, given Mrs. Wons' religious beliefs, that procedure for her is extraordinary. Lastly, we must not assume from her choice that Mrs. Wons was not considering the best interests of her children. She knows they will be well cared for by her family. As a parent, however, she also must consider the example she sets for her children, how to teach them to follow what she believes is God's law if she herself does not. The choice for her cannot be an easy one, but it is hers to make. It is not for this Court to judge the reasonableness or validity of her beliefs. Absent a truly compelling state interest to the contrary, the law must protect her right to make that choice.
GRIMES, J., concurs.
OVERTON, Justice, dissenting.
I dissent. I find that the majority misapplies our decision in Satz v. Perlmutter, 379 So.2d 359 (Fla. 1980). Further, I find the state's interests in preserving life and preventing abandonment of minor children clearly warrant the blood transfusion under these circumstances. The majority fails to cite or discuss recognized authorities which support this view.
To fully explain my position, I find it necessary to expand on the facts set forth in the majority opinion. Norma Wons, the mother of two minor children, sought medical treatment on her own volition from Jackson Memorial Hospital for dysfunctional uterine bleeding, a condition which was essentially causing her to bleed to death. Wons had lost more than ninety percent of her available red blood cells, and, after refusing to consent to a blood transfusion, she lapsed in and out of consciousness. At the hearing, the doctor directing the surgical intensive care unit testified that in his opinion death was imminent without a transfusion. The trial judge ordered administration of a transfusion, stating:
I'm going to now take judicial notice of another fact which has not been expressed. I'll take judicial notice of the fact that, in my opinion, the two children here, one 12 and one 14, would be denied an intangible right they have to be reared by two loving parents, and not one, and I'll take judicial notice of the fact that for the most part the love and the parentage of two parents is far better than one, and that we would end up therefore with better citizens.
I recognize the law, and I know what the law says. You have a competent adult. She has refused to take blood, *103 and she has a right to do so. The only way that we can obviate that right that's guaranteed to her by the [privacy right] of the Constitution of this state is to find an overriding interest, or overriding reason. I'm going to tell you straight out, and it may not be a popular decision, but I think that the right of these two children to be reared by two parents is an overriding reason.
The reasoning of the majority opinion substantially broadens the application of Perlmutter in a manner contrary to the basic principles and philosophies of that decision. In Perlmutter, this Court adopted the opinion of the district court, Satz v. Perlmutter, 362 So.2d 160 (Fla. 4th DCA 1978), which reiterated the four factors to be used in determining whether the state's interests override the individual's right to privacy and religion. These factors are (1) preservation of life, (2) protection of innocent third parties, (3) prevention of suicide, and (4) maintenance of the ethical integrity of the medical profession. Id. at 162. While the majority noted these factors in the instant case, for all practical purposes it ignored them. The majority rejected the contention that the state's interest in preventing Wons from abandoning her minor children through her death was sufficient to justify an override of her wishes when the children's father could assume care for the children. In support of its position, the majority cites St. Mary's Hospital v. Ramsey, 465 So.2d 666 (Fla. 4th DCA 1985). However, I find that decision is not persuasive generally, and, further, I find the facts are distinguishable from those of the instant case. In St. Mary's, the father, who was the subject of the transfusion, was separated from the mother and the child and seldom saw the child. The Fourth District Court, in recognizing that a minor child was involved, specifically noted, "[I]t is difficult to categorize the refusal of treatment here as an abandonment. First, the primary physical residence of the child is with the mother in another state; as a result the father seldom sees the child." Id. at 668.
This Court specifically limited Perlmutter to its facts, with the admonition that the question was
whether a competent adult patient, with no minor dependents, suffering from a terminal illness has the constitutional right to refuse or discontinue extraordinary medical treatment... . [W]e adopt the opinion of the district court as our own with the caveat that the reach of this decision does not extend beyond the particular facts presented in the case before us.

Perlmutter, 379 So.2d at 360 (emphasis added). The majority opinion in this case now broadly expands the narrow Perlmutter holding and represents a general willingness to uphold the rights of an individual to practice a chosen religion and protect rights of privacy without regard for the effects on innocent third parties, particularly minor children.
I believe the better view has been set forth in Application of the President and Directors of Georgetown College, Inc., 331 F.2d 1000 (D.C. Cir.), cert. denied, 377 U.S. 978, 84 S.Ct. 1883, 12 L.Ed.2d 746 (1964), where the court ordered a blood transfusion to save the life of the mother of a seven-month-old child who had refused the transfusion on religious grounds. The court justified its decision in part on the following reasoning:
The patient, 25 years old, was the mother of a seven-month-old child. The state, as parens patriae, will not allow a parent to abandon a child, and so it should not allow this most ultimate of voluntary abandonments. The patient had a responsibility to the community to care for her infant. Thus the people had an interest in preserving the life of this mother.
Id. at 1008 (emphasis added).
It is noteworthy that in both the abovecited case and the instant case, the child would not have become a ward of the state in the event the mother died, since both women were married and had families to care for the child or children. Similarly, in a very extensive, well-reasoned opinion, the New Jersey Supreme Court, in John F. *104 Kennedy Memorial Hospital v. Heston, 58 N.J. 576, 279 A.2d 670 (1971), applied the same principle, as have several New York courts. See, e.g., In re Application of Winthrop Univ. Hosp., 128 Misc.2d 804, 490 N.Y.S.2d 996 (Sup.Ct. 1985); Matter of Melideo, 88 Misc.2d 974, 390 N.Y.S.2d 523 (Sup.Ct. 1976). Other courts have drawn a distinction between cases such as the one presently before this Court and those cases where the effect of a parent's death would not be so grave; for example, in the case of children who had already reached the age of majority or, as occurred in St. Mary's, who resided with the other parent in another state. See, e.g., In re Osborne, 294 A.2d 372 (D.C.App. 1972); St. Mary's Hosp. v. Ramsey, 465 So.2d 666 (4th DCA Fla. 1985).
The majority further fails to recognize the distinction between cases where the prognosis that the patient can be restored to normal life with proper medical procedures is extremely good and cases where the possibility of recovery is slight and the person is diagnosed as terminal. Here, it was unrefuted that, following medical treatment, Wons could return to a normal life, but the majority totally fails to consider this factor in applying Perlmutter. The patient in Perlmutter was a seventy-three-year-old victim of amyotrophic lateral sclerosis (Lou Gehrig's disease), for which there is no cure, and normal life expectancy, from time of diagnosis, is two years. Mr. Perlmutter was virtually incapable of movement and unable to breathe without a mechanical respirator, and the prognosis of death was within a short time. The majority failed to distinguish the terminal nature of his condition from Mrs. Wons' condition, from which she could completely recover with treatment. This distinction based on prognosis was explained by the New Jersey Supreme Court in Matter of Quinlan, 70 N.J. 10, 355 A.2d 647, cert. denied, 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976). That court explained:
We think that the State's interest contra weakens and the individual's right to privacy grows as the degree of bodily invasion increases and the prognosis dims. Ultimately there comes a point at which the individual's rights overcome the State interest. It is for that reason that we believe Karen's choice, if she were competent to make it, would be vindicated by the law. Her prognosis is extremely poor,  she will never resume cognitive life. And the bodily invasion is very great,  she requires 24 hour intensive nursing care, antibiotics, the assistance of a respirator, a catheter and feeding tube.
Id. 70 N.J. at 41, 355 A.2d at 664 (emphasis added). The New Jersey Supreme Court, in Quinlan, also recognized its prior decision in John F. Kennedy Memorial Hospital v. Heston, and reaffirmed the principles requiring a blood transfusion expressed in that case.
In the instant case, given that Mrs. Wons' prognosis was extremely favorable, I find the state's interest in preventing a mother with minor children from abandoning them through death is sufficient justification for ordering the blood transfusion.
The third flaw in the majority's position is that it totally ignores the fourth factor enunciated in Perlmutter and necessarily places doctors and emergency medical facilities in an impossible position by leaving unresolved the issue of when and under what circumstances emergency medical personnel should treat patients who have minor children when they seek treatment but refuse blood transfusions. The New Jersey Supreme Court addressed this issue in John F. Kennedy Memorial Hospital v. Heston and explained:
The question is whether the State may authorize force to prevent death or may tolerate the use of force by others to that end. Indeed, the issue is not solely between the State and Miss Heston, for the controversy is also between Miss Heston and a hospital and staff who did not seek her out and upon whom the dictates of her faith will fall as a burden.

... .
When the hospital and staff are thus involuntary hosts and their interests are pitted against the belief of the patient, we think it reasonable to resolve the problem by permitting the hospital and *105 its staff to pursue their functions according to their professional standards. The solution sides with life, the conservation of which is, we think, a matter of State interest. ... If a court finds, as the trial court did, that death will likely follow unless a transfusion is administered, the hospital and the physician should be permitted to follow that medical procedure.
58 N.J. at 582-83, 279 A.2d at 673 (emphasis added). I fully support the views expressed by the foregoing authorities. Although the right to religious beliefs is absolute, the manner in which those beliefs are conducted may clearly be restricted by governmental action, motivated by legitimate governmental interests, such as those concerning minor children, instances involving not only blood transfusions but exposure to death from snake-handling, ingestion of poison, use of illegal drugs, and the requirement of medical vaccines. See, e.g., Jacobson v. Massachusetts, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 (1905); Town v. Reno, 377 So.2d 648 (Fla. 1979), cert. denied, 449 U.S. 803, 101 S.Ct. 48, 66 L.Ed.2d 7 (1980); Hill v. State, 38 Ala.App. 404, 88 So.2d 880, cert. denied, 264 Ala. 697, 88 So.2d 887 (1956); Lawson v. Commonwealth, 291 Ky. 437, 164 S.W.2d 972 (1942); State ex rel. Swann v. Pack, 527 S.W.2d 99 (Tenn. 1975), cert. denied, 424 U.S. 954, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976); Harden v. State, 188 Tenn. 17, 216 S.W.2d 708 (1948). To justify, as a right of the free exercise of religion, a parent's right to abandon a minor child through a death which is totally unnecessary is, in my view, neither a reasonable nor a logical interpretation of the first amendment. James Madison would not believe that his "free exercise" clause could ever be interpreted in this manner.
For the reasons expressed, I would affirm the trial court.
NOTES
[1] The dissent cites Application of the President and Directors of Georgetown College, Inc., 331 F.2d 1000 (D.C. Cir.), cert. denied, 377 U.S. 978, 84 S.Ct. 1883, 12 L.Ed.2d 746 (1964), in support of the position that the facts of the instant case would constitute an abandonment. That case is not very persuasive as it was a unique proceeding in which a single federal appellate judge entered an order allowing a blood transfusion to be given to an adult Jehovah's Witness. It was not an action by the Circuit Court of Appeals itself, and was never properly before that court. Application of the President and Directors of Georgetown College, Inc., 331 F.2d 1010 (D.C. Cir.1964) (on petition for rehearing denied).
[2] As there would be no abandonment in this case, we do not decide whether evidence of abandonment alone would be sufficient in itself to override the competent patient's constitutional rights.